THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



| | | |
|---|---|---|
| PAUL C. HOLZHAUSER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 11 C 0613 |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE | ) | Magistrate Judge |
| Commissioner of | ) | Arlander Keys |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff, Paul Holzhauser, moves this Court for Summary
Judgment, pursuant to Rule 56(a) of the Federal Rules of Civil
Procedure, to reverse the final decision of the Commissioner of
Social Security (the "Commissioner"), which denied his claim for
Disability Insurance Benefits ("DIB"). *See* 42 U.S.C. § 405(g).
In the alternative, Plaintiff seeks an order remanding the case
to the Commissioner for further inquiry and evidence. Defendant,
Commissioner, has filed a Cross-Motion for Summary Judgment,
asking this Court to affirm the Commissioner's final decision.
For the reasons set forth below, Plaintiff's Motion for Summary
Judgment is granted [16], and the Commissioner's Cross-Motion for
Summary Judgment is denied.

## PROCEDURAL HISTORY

On February 14, 2007, Mr. Holzhauser protectively filed a Title II application for a Period of Disability and Disability Insurance Benefits, alleging disability since October 28, 2006 due to disorders of his back (discogenic and degenerative) and carpal tunnel syndrome. (R. 59.) The Social Security Administration (the "SSA") denied Plaintiff's claim on June 6, 2007. (R. 59.) Plaintiff filed a Request for Reconsideration on June 13, 2007 (R. 72.), which was denied on July 13, 2007. (R. 76.)

On July 19, 2007, Mr. Holzhauser filed a timely request for a hearing before an Administrative Law Judge (the "ALJ"). (R. 80.) A hearing was held on October 8, 2008. (R. 28-58.) An unfavorable decision was rendered on May 26, 2009 by ALJ Mary Ann Poulose (R. 11.) Plaintiff then filed a Request for Review of the ALJ's Hearing Decision on July 1, 2009. (R. at 10.) The Appeals Council denied the Request for Review on January 13, 2011; therefore, the ALJ's decision stands as the Commissioner's final decision. (R. 1.) As a result, Mr. Holzhauser commenced this action seeking the reversal of the Commissioner's final decision or, in the alternative, remand for further proceedings.

## A. Evidence Presented at Plaintiff's Hearing

## 1. Plaintiff's Testimony

Mr. Paul Holzhauser testified to the following: he completed the 10th grade and obtained a GED (R. 33.)  He is divorced and has one 25 year old son from his previous marriage.  He currently lives with his girlfriend, Lynn Kenney, their 3 year old son, as well as his older son.  (R. 33.)  He had been a welder and bricklayer for a majority of his life, but currently is not working. (R. 35.)

After his initial injury, he stopped working until his brother-in-law hired him to lay bricks for the company he owned. (R. 48-49.)  He only lifted 4 pounds, the weight of a brick or a shovel of mortar.  (R. 50.)  He continued to experience constant back problems and was in pain most of the time at work, however, his brother-in-law allowed him to take as much time off as he needed, and the other workers (many of them younger relatives) catered to him considerably.  (R. 51.)

He stopped working for his brother-in-law, and has made no attempt to find another job because of his back pain, which has continually worsened over the past 17 years.  (R. 37.)  He is unable to do much of anything and is often bedridden.  (*Id.*)  He

sometimes crawls to the couch to watch television, read magazines or the newspaper. (R. 39.) His girlfriend or his older son help him by doing the cooking, housekeeping, lawn maintenance and taking care of his three year old. (R. 38.) He constantly shifts positions, especially on cold and rainy days which cause his back to stiffen more than usual; he can only sit for 10 minutes before his back hurts, and standing in one place for too long causes him back pain as well. (R. 39-41.) Additionally, his legs often spasm, and when driving, his whole leg from the knee up feels numb. He sometimes has to pull over and get out to ease the spasm and numbness. He describes it as like "electricity shooting through..." (R. 46.)

He exercises daily by stretching for 20 minutes, and he finds that laying down and pulling his legs up to his chest helps to ameliorate his pain. (R. 40.) He tries to avoid lifting anything, as it causes his back to go out. He explained that his back "going out" means that it swells and he has to stay off it. (R. 52.) When he sneezes, he must brace himself, as his back will easily go out that way. (R. 45.) He estimates his back goes out around a dozen times a year, during which he is bedridden and totally dependant on his family for everything. (R. 36.) Once his back goes out, it can be anywhere from a

4

couple of days, a couple of weeks, to several months before it gets better. (R. 48.)

He has had several surgeries and countless epidural injections, but he no longer has the money or insurance to keep up with them. (R. 45.) He has also seen many different chiropractors and Narapaths in an effort to find pain relief. (R. 47.) He regularly takes anti-inflammatories, and to combat the pain he takes Methadone four times a day, which has a side effect of making him drowsy. (R. 46.) Although his girlfriend supports him financially, he does not have health insurance. However, because he served in the military for three years, he has begun seeking medical attention at the VA. (R. 49.)

## 2. Vocational Expert's Testimony

Ms. Michelle Peters, a vocational expert (the "VE"), testified at Plaintiff's hearing to the following: Mr. Holzhauser's past work was as a bricklayer, which is a skilled occupation, heavy in physical demand. (R. 54.) The ALJ asked if a hypothetical person with the same age, education, work experience, and skill set as Mr. Holzhauser's "was limited to sedentary, he would grid out, correct?", and the VE testified "yes at 201.14."[1] (R. 54.) Next, the ALJ asked if a hypothetical person of the same age, education, work experience,

---

[1]The VE is referring to 20 C.F.R. Pt. 404, Subpt. P, App.2, Rule 201.14.

and skill set as Mr. Holzhauser's were to be limited to light work with a sit/stand option at will, occasional pushing and pulling with the upper extremities, occasional climbing of ladders, only occasional stooping, crouching, kneeling, and never any crawling, would he then be able to perform his past work? The VE responded that, considering those specifications, he could not perform his past work, but he could perform assembly types of positions of approximately 2,500, hand packaging positions of approximately 1,800, and inspection positions of approximately 1,500. (R. 55.) Finally, the ALJ asked if such a hypothetical person were to have to miss more than two days of work a month, would that reduce the number of available positions? The VE responded that, if Mr. Holzhauser were to have to miss more than two days a month, it "would eliminate all substantial gainful activity, therefore no work, your honor." (R. 56.)

## 3. Medical Evidence

### I. Back

Mr. Holzhauser submitted medical records to the ALJ detailing his treatments since he fell from the top of a stairwell and hit his lower back on the staircase in 1990. He was first diagnosed on May 14, 1990 with fractures of T12 and L1 and received a TENS home unit from Rush-Presbyterian Occupation Health Centers

("Rush"). (R. 256.) On January 11, 1991, Mr. Holzhauser was placed on sedentary to light restrictions. (R. 263.) Rush advised that he could perform restricted work on February 8, 1991. (R. 263.) On March 29, 1991, Mr. Holzhauser was placed on a 30 pound weight lifting restriction, which his orthopedic surgeon indicated would in all likelihood be permanent. (R. 265.) On October 21, 1991, a lumbar myelogram and CT scan showed a large disc herniation at L4-5 and an amputation of the left L5 and S1 nerve root. (R. 275-6.)

Several years passed, but Mr. Holzhauser's pain continued. On May 5, 1998 an MRI of the lumbar spine was performed due to Plaintiff's complaints of lower back and head pain. The results showed abnormal soft tissue protrusions affecting the L5 and S1 nerve roots, suggestive of a recurrent herniated disc and a focally herniated disc repetitively. Additionally, a decrease in disc height with desiccated disc at the L4-5 and L5-S1 levels was noted. (R. 282.) On June 24, 1998, he had L5-S1 hemilaminectomy, as well as a discectomy and laminectomy at L4-5 with right foramnotomy. (R. 287.)

By October 30, 1998, an assessment of current functional capabilities was performed by Dr. Albert Bosch of HealthSouth Sports Medicine and Rehabilitation Center of Joliet which

concluded that Mr. Holzhauser could not perform his past work as a welder and would need a job "classified in the light category of work allowing him to frequently change positions from sitting, standing, and walking." (R. 303.)

On April 13, 2000, Mr. Holzhauser put in a claim to the Masonry Institute that he had lower back pain and was unsure if it was an aggravation of an old injury or a new one on the job. (R. 313.) He was treated with caudal epidural steroid injections November 4, 2002 (R. 328), November 25, 2002 (R. 325), February 19, 2003 (R. 323), as well as on April 14, 2004. (R. 324).

Mr. Holzhauser began seeing Dr. Amin of the Rush Pain Center in 2007. On February 12, 2007, Dr. Amin recommended no lifting over 10 pounds, as well as no continuous standing or sitting, and to do sedentary work only. (R. 378.) His next assessment, on May 7, 2007, indicated his lower back pain was at a 5 out of 10 and it substantially interfered with his activities of daily life (bathing, dressing, cooking, etc.) (R. 388.) Dr. Amin noted his physical activity at "[l]imited standing or walking", his work status at "[t]emporary total disability, off work", and his medication for methadone to be refilled. (*Id.*) His notes on June 4, 2007 are similar. (R. 389.)

Mr. Holzhauser was diagnosed with degenerative disc disease of the lumbar spine at the VA Joliet Clinic by Dr. Rafia Ali on January 31, 2008. (R. 205.) Dr. Ali opined that Mr. Holzhauser was not to lift more than 10 pounds, that his condition was static, and that he was to take 10mg of methadone four times a day. (*Id.*) Mr. Holzhauser was admitted to Hines VA Hospital on March 28, 2009 with the primary diagnosis of low back pain. (R. 475.) He was discharged on March 30, 2009, instructed to follow up with the pain clinic in a week, and to take flexeril and methadone as needed. (*Id.*) His outpatient medications included taking ibuprofen twice a day for pain, 10mg of cyclobenzaprine HCL every 8 hours for muscle relaxation, and starting a nicotine gum regimen for smoking cessation. (R. 476.)

## II. Hands

The first documented medical evidence of Mr. Holzhauser's hand pain appears in the record on October 5, 2006. He complained of numbness and tingling in the long and ring fingers, and some along the index and thumb to Dr. William J. Baylis, D.O., of the Parkview Musculoskeletal Institute. (R. 428.) On October 16, 2006, Dr. Baylis concluded that Mr. Holzhauser was indeed suffering from severe right-sided carpal

9

tunnel syndrome. He found the motor distal latency to be severely prolonged and the sensory responses were absent. There was also mild left-sided carpal tunnel syndrome (R. 427.) On November 27, 2006, Dr. Baylis ordered a PT with ROM, strengthening and evaluation (R. 335.) On November 30, 2006, while at Morris Hospital Rehabilitation, Mr. Holzhauser indicated on his intake questionnaire that he had an accident in 2005 and has had carpal tunnel for 1 ½ years. (R. 344). He started a therapy routine that was to involve twice weekly sessions for three to four weeks in order to target the pain in his right wrist, increase his grip, decrease the numbness found in his third and fourth fingers, and to decrease the sensitivity around the scar tissue from the surgical incision. The long-term goals were to control pain, strengthen, and return to work. (R. 352.) His treatment included ultrasounds, iontophoresis, scar massage, and ROM/strengthening exercises.

By December 20, 2006, Mr. Holzhauser had completed five physical therapy sessions on his right hand. (R. 543.) He had slight improvement regarding numbness, no nocturnal pain, AROM of wrist improved slightly, and grip improved from 8kg to 13 kg. (*Id.*) However, he still suffered from shooting pains from the fourth finger to the mid-forearm, a symptom he did not have

prior to surgery, as well as still being very tender in the palm with any pressure. (*Id.*) Mr Holzhauser indicated to Dr. Baylis that he wished to not continue any longer with the sessions due to cost and skepticism of its effectiveness. (*Id.*) Dr. Baylis noted that Mr. Holzhauser's pain tolerance was likely decreased due to the chronic pain medication he was taking to combat his back pain. Dr. Baylis also noted that Mr. Holzhauser "does not seem able to return to his regular work duties as a mason at this time." (*Id.*)

By mid-2007, Mr. Holzhauser's right carpal tunnel was considered resolved. A review of Mr. Holzhauser's right hand on June 20, 2007, found that he had pain and some difficulty making a fist to the PIP joints of the index, long, ring, and small fingers. However, his motion was almost full, and although there was still stiffness to his fingers and some hand swelling, Dr. Baylis released him to full duty, noting that his carpal tunnel was resolved with some interphalangeal degenerative changes. (R. 398.)

By late 2007, Mr. Holzhauser was experiencing severe numbness in his left hand, and on January 10, 2008 he saw Dr. Baylis regarding the pain. (R. 413.) Dr. Baylis noted that Mr. Holzhuser's increasing symptoms on the left were similar to

what he had experienced with his right, and he found that there was still weakness and some arthritis in the right hand, as well. (*Id.*) Dr. Baylis confirmed that there was severe left carpal tunnel and that a release would be necessary. (*Id.*) Finally, Dr. Baylis noted that Mr. Holzhauser had been a bricklayer and that "[c]ertainly his problem is work related and/or work aggravated, but he has not been back to work in a while, yet I think his initial symptoms that we treated him for initially were probably work aggravated secondary to his occupation." (*Id.*) On January 16, 2008, Dr. Baylis performed a release of the transverse carpal ligament on Mr. Holzhauser's left hand (R. 423.)

## 4. State Agency Physician

On May 19, 2007, a state agency physician, Afiz Taiwo, M.D., conducted an internal medicine consultative examination of Mr. Holzhauser. (R. 379-82.) Prior to the examination, he reviewed all the information sent to him by the Bureau of Disability Determination Services, including the Morris Hospital Physical Rehabilitation note from November 30, 2006 and the activity of daily living questionnaire. (R. 379.) Plaintiff complained to him of constant dull aching pain to the lower back that radiated into the right buttock and leg with

pain.  The pain was 5/10 on his best days and a 9/10 on his worst, aggravated with walking, standing, sitting and lifting. (R. 379.)

Dr. Taiwo's report indicated that Plaintiff's fourth and fifth fingers were swollen and he had sharp aching pain to the metacarpal and PIP joints.  His Grip strength was 4/5.  (R. 381.)  The report also indicated that Plaintiff wore an elastic lumbar brace for support and that there was tenderness at L3 through L5.  Flexion was 90 degrees with pain, and extension was 15 degrees with pain.  Dr. Taiwo ordered an x-ray of the lumbar spine, and on May 22, 2007 he reported the impression of mild arthritic type changes that were seen involving the lower lumbar spine at L4-5, as well as a small left lateral spur formation seen at the L1-2 level.  (R. 384.)

**B.  The ALJ's Decision**

On February 14, 2007, the ALJ issued her decision, concluding that Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act from October 28, 2006 though the date of her decision.  (R. 14-22)  The ALJ declared she had reviewed all of the evidence of record in making her decision, and applied the five step inquiry outlined in the Social Security regulations, 20 C.F.R. § 404.1520.

At step one, the ALJ determined that Mr. Holzhauser may have engaged in substantial gainful activity since his alleged onset date of disability, as the record shows substantial earnings posted to his account after October 28, 2006 that were never explained. (R. 16.) The ALJ declared that, while Plaintiff's benefits could be denied at step one for work activity, she would proceed with the analysis.

At step two, the ALJ concluded that Mr. Holzhauser had at least two medically determinable "severe" impairment under 20 C.F.R. 404.1520(c). (R. 16-17.) The ALJ found that Mr. Holzhauser had a disorder of the back, causing chronic back pain syndrome, and that he suffered from carpal tunnel syndrome, which were "severe impairments" within the meaning of the Act and regulations. (R. 16.)

At step three, the ALJ concluded that, despite these conditions, Mr. Holzhauser had no impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526). (R. 17.) The ALJ noted that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms. (R. 19.) Nevertheless, the ALJ found that Plaintiff's statements

about the intensity, persistence, and limiting effects of his symptoms were not entirely credible to the extent that they were inconsistent with his residual functional capacity assessment. *(Id.)*

At step four, in determining Mr. Holzhauser's RFC, the ALJ concluded that he could perform less than the full range of light exertional level work as defined in 20 C.F.R. § 404.1567(b). (R. at 18.) Specifically, based on the residuals of arthritic back pain, the ALJ found that Plaintiff required a sit/stand option as well as only occasional pushing and pulling of objects weighing twenty pounds, climbing, stooping, crouching, and kneeling. Furthermore, the ALJ found that Plaintiff needed to avoid crawling and concentrated exposure to cold and humidity due to residuals of arthritic pain. (*Id.*) With this RFC, the ALJ found that Plaintiff was unable to perform any past relevant work. (R. at 20.)

At step five, the ALJ concluded that, although Plaintiff could not perform his past work, his RFC would enable him to perform a significant number of other jobs, including assembly line, hand packaging, and inspector type positions, which totaled 5,800 within the national economy. (R. at 21.)

As a result of the above listed findings, the ALJ determined that Plaintiff was not disabled, as defined in the Social Security Act, at any time from his alleged onset date of October 28, 2006 through the date of the ALJ's decision.  (R. at 21.)

## STANDARD OF REVIEW

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 409 (1971).  In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)).  Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts.  *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

While an ALJ need not address every piece of evidence in the record, she must articulate her analysis by building an "accurate and logical bridge from the evidence to [her] conclusion," so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if the decision is not sufficiently articulated so as to prevent meaningful review, the Court must remand. *Sims v. Barnhart*, 309 F.3d 424, 429 (2002).

## SOCIAL SECURITY REGULATIONS

An individual claiming a need for DIB must prove that he or she has a disability under the terms of the SSA. The Social Security Regulations prescribe a sequential five-part test to determine whether an individual is disabled. *See* 20 C.F.R. §§404.1520 and 416.920 (2001). The ALJ must determine: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether such impairment or combination of impairments meets or equals any impairment, listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1, as being so severe as

to preclude gainful activity; (4) whether the claimant is unable to perform his or her past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520 and 416.920; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). A finding of disability requires an affirmative answer either at step three or step five. A negative answer at any step (other than step three) precludes a finding of disability. *Id.* At steps one through four, the claimant bears the burden of proof, but at step five, the burden shifts to the Commissioner. *Id.*

## DISCUSSION

Plaintiff contends that the ALJ erred in concluding that he is not disabled. Plaintiff argues that the ALJ's decision should be reversed or remanded for two primary reasons. First, because the ALJ erred at step one by stating that there was evidence of substantial gainful activity since the alleged onset date that was left unexplained, although Plaintiff submitted evidence explaining the monies as disability payments. Second, because the ALJ erred at step five by failing to adequately assess the evidence of his residual functional

capacity, and to what extent any of Plaintiff's symptoms would affect his ability to work.

## A. The ALJ's Step One Determination

The ALJ questioned earnings received by Plaintiff after his alleged onset date totaling $6,800 in 2007, as well as monies received in 2006, and left the record open for 14 days in order to allow Plaintiff time to provide information on these payments. (R. 34.) Plaintiff timely submitted via fax information showing payments from November 4, 2006 (R. 241.) through April 7, 2007 from the Masonry Institute demarcated as disability. (R. 206.) The Commissioner dismisses the error, contending that, although the ALJ may have erroneously noted that Plaintiff did not explain his earnings, she, nonetheless, continued with the sequential analysis through the final step. Therefore, the Commissioner opines, the first step of the sequential evaluation is inconsequential and does not constitute legal error. (Com.'s brief at 4.)

The Court agrees with the Commissioner that, because the ALJ proceeded with the sequential analysis through step five, her failure to realize Plaintiff's explanation of his earnings did not constitute reversible legal error. Where the Court and the Commissioner differ, however, is that the Court views this

error as consequential. The ALJ declared that "[w]hile the claimant's benefits could be denied at Step 1 for work activity, the undersigned will continue on with the analysis." (R. 16.) However, substantial evidence was provided that would lead a reasonable mind to conclude that Mr. Holzhauser's earnings during the time period in question were for disability, not "work activity."

When the ALJ left the record open for 14 days in order to garner further information, yet, decided Plaintiff's claim without analyzing that information, the ALJ provided no accurate and logical bridge from the evidence to her conclusion. In turn, the Court is thus prevented from affording Plaintiff a meaningful review of the SSA's findings at step one. Moreover, the Court has no way of knowing whether the ALJ's mistaken conclusion that the monies were never explained played any role in her reaching an unfavorable decision, or not.

## B. The ALJ's Residual Functional Capacity Determination

Plaintiff argues that the ALJ erred in assessing his RFC, and conversely, the Commissioner argues that the ALJ's RFC assessment was objectively reasonable and proper. Specifically, Plaintiff argues that, when the ALJ made her RFC

Capacities Evaluation ("FCE") and other 1998 medical records, and gave considerably less deference to the medical records and assessments made closer to the date Plaintiff stopped working, which was on October 28, 2006. The Commissioner contends that, although the FCE was completed eight years prior to Plaintiff's alleged onset date, the ALJ was reasonable in her reliance upon the earlier FCE, as well as her selection of the other medical evidence she chose to rely upon in reaching her decision. (Com.'s brief at 5.)

"'Residual functional capacity' is that which a claimant can still do despite her physical and mental limitations." *Clifford v. Apfel*, 227 F.3d 863, 873 n.7 (7th Cir. 2000) (citing *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999)); 20 C.F.R. § 404.1545(a). When an ALJ makes a RFC determination, the ALJ should consider the claimant's ability to lift weight, sit-stand, walk, and push-pull. *Clifford*, 227 F.3d at 873 n.7 (citing 20 C.F.R. § 404.1545(b)). The ALJ uses the claimant's RFC to determine a claimant's ability to engage in various levels of work (e.g. sedentary, light, medium, heavy, or very heavy). *Clifford*, 227 F.3d at 873 n.7 (citing 20 C.F.R. § 404.1567). An ALJ's RFC conclusion must be supported by substantial evidence in the record. *Clifford*, 227

F.3d at 873.  Moreover, for meaningful review, the reviewing
court "must be able to trace the ALJ's path of reasoning."
*Clifford*, 227 F.3d at 874 (citing *Rohan v. Chater*, 98 F.3d 966,
970 (7th Cir. 1996) (noting that an ALJ's explanation must take
into account significant evidence that would support the
opposite conclusion so that a reviewing court has some idea why
the judge rejected it)).  Furthermore, an ALJ's decision to
deny DIB to a plaintiff "must be based on consideration of all
relevant evidence and the reasons for [the ALJ's] conclusion
must be stated in a manner sufficient to permit an informed
review." *Parris v. Barnhart*, 2004 WL 3008744, *7 (N.D.Ill.,
2004) (citing *Ray v. Bowen,* 843 F.2d 998, 1002 (7th Cir.
1988)).

In the instant case, the ALJ determined that Mr. Holzhauser
has the RFC to perform a range of light exertional work, and in
making this determination, she gave considerable weight to
several medical records from June and July of 1998, a FCE
completed in October of 1998, and a resonance imaging test of
Plaintiff's lumbar spine from May 22, 2007.  (R. 18-19.)
According to the ALJ, she considered the entire record when she
made the RFC determination, but found the fact that Plaintiff
had suffered no additional injury since his October 1998 FCE,

had suffered no additional injury since his October 1998 FCE, as well as his March 2007 MRI showing only mild arthritic changes involving the lower lumbar spine, particularly compelling. (R.20) She concluded that Plaintiff required a sit/stand option, as well as only occasional pushing and pulling of objects weighing twenty pounds, climbing, stooping, crouching, and kneeling. (R. 18.) The ALJ additionally noted that he should avoid crawling and concentrated exposure to cold and humidity due to residuals of arthritic pain. *(Id.)* Regarding Plaintiff's carpal tunnel syndrome, the ALJ found that Plaintiff's "impairments healed status post surgery such that the impairment did not last twelve months and has not precluded the performance of light exertional work." (R. 20.)

Although the ALJ concluded that Plaintiff could perform light exertional work and occasionally lift twenty pounds, substantial medical evidence in 2007 and 2008 directly conflict with that conclusion. On February 12, 2007, Dr. Amin recommended no lifting over 10 pounds, as well as no continuous standing or sitting, and to do only sedentary work due to Mr. Holzhauser's lumbar radiculopathy. (R. 378.) At Plaintiffs next assessment on May 7, 2007, Dr. Amin noted his physical activity at "[l]imited standing or walking", his work status at

"[t]emporary total disability," and he refilled his medication for methadone, a pain reliver. (*Id.*) Plaintiff was diagnosed with degenerative disc disease of the lumbar spine at the VA Joliet Clinic by Dr. Rafia Ali on January 31, 2008. (R. 205.) Dr. Ali opined that Mr. Holzhauser was not to lift more than 10 pounds, that his condition was static, and that he was to take 10mg of methadone four times a day. (*Id.*) Mr. Holzhauser was admitted to Hines VA Hospital on March 28, 2009 with the primary diagnosis of low back pain. (R. 475.) He was discharged on March 30, 2009, instructed to follow up with the pain clinic in a week, and to take flexeril and methadone as needed. (*Id.*) With all of the above more recent medical findings of Plaintiff's pain, prescribed medications, work capabilities, and lifting restrictions, the Court is unable to follow the ALJ's reasoning that concludes with Plaintiff's 1998 FCE being a better barometer of his current RFC than his 2007 and later medical evaluations.

The ALJ reconciled her RFC determination by stating that she found the Plaintiff's current physicians' advised restrictions "conclusory and inconsistent". (R. 20.) The ALJ declared that Plaintiff's physicians "have not articulated a reason for these restrictions" and that "less credit is given

to these opinions." (*Id.*) However, an ALJ's RFC conclusion must be supported by substantial evidence in the record. *Clifford*, 227 F.3d at 873. Moreover, for meaningful review, the reviewing court must be able to trace the ALJ's path of reasoning.

Here, the ALJ never provided any explanation as to how she determined that Plaintiff's recent treating physicians' opinions failed specifically, or why their findings should be deemed any less credible than those made by physicians in 1998. Dr. Amin completed Plaintiff's work status instruction report in February of 2007, and in May and June of 2007, Dr. Amin saw Plaintiff for follow-up assessments because he was receiving protracted prescriptions of narcotic medications for his pain. (R. 388-89.) From these facts alone, the Court is unable to determine how the ALJ decided that Dr. Amin's medical findings should be deemed conclusory and inconsistent, or not. Moreover, the record reflects that Dr. Rafia Ali is now a treating source at the VA clinic, he will be having an ongoing relationship with Plaintiff, and after first examining him on January 1, 2008, Dr. Ali concluded that Plaintiff had degenerative disc disease and was unable to lift more than 10

pounds. (R. 436.) The Court neither finds anything conclusory nor inconsistent about Dr. Ali's findings.

The ALJ acknowledged that she gave less credit to these opinions, but she did not provide the Court with a path of reasoning as to how and why she chose to do so, leaving the Court with no means for an informed review. (R. 20.) Moreover, it is reasonable to conclude that anyone suffering from what is uncontested to be degenerative disc disease, could likely have more difficulties and pain as the spine degenerates over time. Therefore, the ALJ's increased reliance upon older medical and physical assessments necessitates more of an explanation than simply stating the recent findings to be "conclusory."

Next, Plaintiff argues that the ALJ failed to consider substantial evidence of carpal tunnel existing well over one year, while the Commissioner contends that the ALJ's decision was supported by substantial evidence that Plaintiff's carpal tunnel was healed within a year. The Court agrees with the Commissioner that evidence from the record reflects that Plaintiff's carpal tunnel was first indicated on October 5, 2006. (R. 428.), and by June 20, 2007, although there were still some issues of tenderness, it was considered resolved and

noted on a November 30, 2006 questionnaire at Morris Hospital
Physical Rehabilitation that he had been dealing with carpal
tunnel since 2005, or for over one and a half years. (R. 344.)
However, the Court finds this one notation to be unsubstantial
evidence from which to base Plaintiff's onset date of carpal
tunnel upon. Therefore, the Court finds that the ALJ's
determination as it relates to carpal tunnel was supported by
substantial evidence.

Finally, upon close review of the VE's testimony, the Court
finds one particular exchange between the VE and the ALJ
particularly informative, as it relates to a step five
determination, however, it was never discredited by the ALJ,
nor addressed by either the Plaintiff or the Commissioner.
During Mr. Holzhauser's testimony, he repeatedly mentioned how
easily and often his back goes out, where he is bedridden for
days to even months at a time. (R. 45.) The ALJ asked the VE
whether a person with Plaintiff's limitations, who had to miss
more than two days of work a month, would that reduce the
number of possible positions in the national economy. (R. 56.)
The VE responded that, having to miss work with his limitations
"would eliminate all substantial gainful activity, therefore no
work, your honor." (*Id.*) This declaration was not discredited

"would eliminate all substantial gainful activity, therefore no work, your honor." (*Id.*) This declaration was not discredited by the ALJ and never discussed by either party, yet it is important to a step five determination. Therefore, upon remand, the Court encourages the ALJ to analyze and make a decision on the credibility and weight of this testimony.

Because the Court has no means of determining what affect, if any, the ALJ's erroneous step one determination had on her overall decision, as well as the Court not being satisfied that, when the ALJ made her RFC determination, she considered all the relevant evidence and that she stated her reasons for her determination in a manner sufficient to permit an informed review, the Court must remand for further proceedings.

### CONCLUSION

For the reasons set forth above, the Court denies the Commissioner's Cross-Motion for Summary Judgment and grants Mr. Holzhauser's Motion for Summary Judgment [16]. The decision is remanded for further proceedings consistent with this opinion.

Date: February 13, 2012     E N T E R E D:

MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT